IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

STATESBORO DIVISION

| | |
|---|---|
| LEROY BRANTLEY, JR.; HAROLD H. RICKS; ROGER SMITH; and SHON BUTLER, on behalf of themselves and all others similarly situated, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) CV 617-089 ) |
| HANDI-HOUSE MFG. CO., and DONALD FLANDERS, | ) ) ) |
| Defendants. | ) ) |

**O R D E R**

On behalf of current and former employees of Defendant Handi-House Mfg. Co. ("Handi-House"), the class action complaint seeks damages from the alleged operation of a payday lending scheme charging weekly interest of 30% and collecting $1.17 million of interest over a five-year class period. (Compl., doc. no. 1, ¶¶ 29-31.) In their Motion for Sanctions for Spoliation of Evidence, Plaintiffs accuse Defendants of intentionally destroying weekly lists of outstanding loans. (Doc. no. 65.) The Court **DENIES** the motion and **FINDS** Plaintiffs failed to carry their burden of proving Defendants destroyed loan lists after the litigation commenced or reasonably knew Plaintiffs were contemplating a lawsuit.

**I.   BACKGROUND**

The complaint alleges Handi-House employees, primarily General Manager and Director of Sales James Akridge and Plant Manager John Wilkerson, made weekly cash loans to Handi-House employees in advance of their paychecks, charging $6.00 in interest on every $20.00 loaned. (Compl. ¶¶ 25, 31; RICO Statement, doc. no. 1-2, p. 7.) Akridge and Wilkerson allegedly forced Plaintiffs to agree to these loans by verbal threats and shows of authority, and they threatened any Handi-House employee who refused to take a loan would be suspended without pay or terminated. (Compl. ¶ 37.)

Plaintiffs further allege Defendant Flanders, CEO and CFO of Handi-House, and his wife Stephanie "have overseen the illegal lending operation and have taken steps to ensure that their co-conspirators continue operating it within Handi-House facilities." (Id. ¶ 38; doc. no. 1-2, p. 7.) However, Akridge and Wilkerson averred they operated the loan program personally and kept all interest and profits. (Doc. no. 65-5, pp. 5, 8; doc. no. 65-7, pp. 5, 8.) Moreover, according to Handi-House employee Charlie Fluellen, Handi-House ran an institutional loan program that allowed employees to obtain interest-free loans. (Fluellen Dep., doc. no. 78-2, 25:18-27:19.)

The loan repayment procedure for the payday loan program was quite simple. Brenda Williamson, who is the employee responsible for preparing payroll checks for Handi-House, allegedly annotated the paychecks of employees receiving loans with the loan balance and distributed the borrowers' paychecks to Akridge and Wilkerson for collection. (Compl. ¶ 39.) Akridge and Wilkerson required borrowers to endorse the paycheck and hand it back to them. (Johnson Dep., doc. no. 78-1, 67:11-24.) Akridge and Wilkerson cashed the paychecks in the office, kept cash sufficient to cover the loan balance, and gave the

2

remaining cash to the borrower. (Id. at 71:1-7.) At some unidentified point in time, Akridge and Wilkerson started writing the loan balances on a sticky note attached to each pay stub rather than directly on the pay stub. (Johnson Aff., doc. no. 65-4, ¶ 7.)

Throughout the loan program's existence, on a weekly basis Akridge and Wilson "created a notebook sheet of paper for each personal loan that outlined the amount of the loan and interest associated with the loan, if any." (Doc. no. 65-5, p. 6; doc. no. 65-7, p. 6.) Akridge and Wilkerson testified they regularly discarded or destroyed the loan lists through termination of the loan program in July 2017. (Wilkerson Aff., doc. no. 69, Ex. A, ¶ 3; Akridge Aff., doc. no. 69, Ex. B, ¶ 4.) However, after litigation commenced, Alfred Johnson, a Handi-House employee and putative class member, produced to Plaintiffs' counsel a photograph he took at work of such a loan list on December 7, 2017. (Doc. no. 65-2, Ex. A; Johnson Aff. ¶¶ 8-12.) This prompted Plaintiffs to file the present sanctions motion alleging Defendants purposefully destroyed this loan list and possibly other loan program documents after actual pendency of this litigation or after they reasonably knew Plaintiffs were contemplating litigation. (Doc. no. 65.)

Johnson provided the following affidavit and deposition testimony regarding the loan list. Contrary to Defendants' contention, Johnson testified the loan program continued after July 2017 and into December 2017, with the important modification that Akridge and Wilkerson now trusted borrowers to cash their own paychecks and remit the loan balances to them. (Johnson Dep. at 75:6-76:15, 80:4-18, 84:2-17.) On December 7, 2017, co-worker Charlie Fluellen approached Johnson and showed him a loan list. (Johnson Aff. ¶ 8.) Johnson claimed by affidavit he knew the list was from the week of December 4, 2017 because the list accurately reflected he borrowed $20.00 that week and owed $26.00. (Id. ¶

3

9.) He later claimed during his deposition the date of December 4, 2017 was written on the reverse side of the list, of which he failed to take a picture. (Johnson Dep. at 134:1-20.) Johnson claimed Fluellen "found" the list "up there by James's office" and later returned the list to Akridge. (Id. at 119:11-13; Johnson Aff. ¶¶ 8, 12.)

Fluellen testified Johnson is lying and he had never seen the list before his deposition. (Fluellen Dep. at 35:2-14.) Moreover, Fluellen testified he never received a personal loan from Akridge and Wilkerson and instead took advantage of interest-free employee loans offered by Defendant Handi-House. (Id. at 25:18-27:25.) Akridge and Wilkerson state by affidavit the list was created in early July 2017 but later lost. (Wilkerson Aff. ¶¶ 2, 5-6; Akridge Aff. ¶¶ 2, 6-8.) Three Handi-House employees, two of whom were identified as borrowers on the loan list in question, also submitted sworn statements confirming all loan operations ceased in July 2017. (Williams Aff., doc. no. 71-3; R. Woods Aff., doc. no. 71-4; T. Woods Aff., doc. no. 71-5.)

Pursuant to stipulation of the parties, the Court dismissed all Defendants except Handi-House and Donald Flanders, as well as Counts Seven and Ten of the Complaint. (Doc. nos. 83, 85.) Therefore, the Court will consider the sanctions motion only as to the remaining Defendants, Handi-House and Flanders.

## II. DISCUSSION

### A. Legal Standards

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." Graff v. Baja Marine Corp., 310 F. App'x 298, 301 (11th Cir. 2009) (quotations omitted). While spoliation is governed by federal law, the Eleventh Circuit has not

developed its own specific guidelines but rather has deferred to the spoliation factors enumerated under Georgia law. See Flury v. Daimler Chrysler Corp., 427 F.3d 939, 944 (11th Cir. 2005) ("Federal law in this circuit does not set forth specific guidelines, therefore, we will examine the factors enumerated in Georgia law.") (citation omitted).

In Flury, the Eleventh Circuit identified the following five factors to be considered when determining whether sanctions are warranted and to what extent:

> (1) whether the defendant was prejudiced as a result of the destruction of evidence; (2) whether the prejudice could be cured; (3) the practical importance of the evidence; (4) whether the plaintiff acted in good or bad faith; and (5) the potential for abuse if expert testimony about the evidence was not excluded.

Id. at 945; see also Oil Equip. Co. v. Modern Welding Co., 661 F. App'x 646, 652 (11th Cir. 2016) (identifying five spoliation factors from Flury).

The presence of bad faith is a threshold requirement for spoliation sanctions. See Bashir v. Amtrak, 119 F.3d 929, 931 (11th Cir. 1997) ("In this circuit, an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith.") (citation omitted); see also Woodard v. Wal-Mart Stores E., LP, 801 F. Supp. 2d 1363, 1371-72 (M.D. Ga. 2011) (noting tension between Flury and Bashir). Indeed, "'[m]ere negligence' in losing or destroying the records is not enough for an adverse inference, as 'it does not sustain an inference of consciousness of a weak case.'" Bashir, 119 F.3d at 931 (quoting Vick v. Texas Emp't Comm'n, 514 F.2d 734, 737 (5th Cir. 1975)[1]). If warranted, a court may impose the following sanctions: "(1) dismissal of the case; (2) exclusion of expert testimony; or (3) a jury instruction on spoliation of evidence which raises

---

[1] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

a presumption against the spoliator." Flury, 427 F.3d at 945 (citing Chapman v. Auto Owners Ins., 469 S.E.2d 783, 784 (Ga. App. 1996)).

> **B. Plaintiffs Failed to Prove Akridge and Wilkerson Continued the Loan Program After Service of the Complaint, and They Also Failed to Prove Akridge and Wilkerson Destroyed the Loan List At Issue**

Plaintiffs base their spoliation contention on (1) a picture of the loan list taken by Johnson on December 4, 2017; (2) Johnson's testimony that Fluellen "found" the list in Akridge's work area and presented it to him; and (3) Johnson's testimony the loan list concerned loans issued the week of December 4, 2017. After careful consideration of the entire record, however, the Court finds Johnson's testimony is not credible for at least four reasons.

First, Fluellen testified Johnson is lying when he says Fluellen "found" the list "up there by James's office" on December 7, 2017, showed it to him, and returned it to Akridge. (Fluellen Dep. p. 35:2-14; Johnson Dep. p. 119:11-13; Johnson Aff. ¶¶ 8, 12.) Indeed, Fluellen testified he had never seen the list before his deposition. (Fluellen Dep. p. 35:2-14.)

Second, Johnson's contradictory description of their supposed encounter is implausible. According to Johnson, he and Fluellen were not friends, and Fluellen did not know Johnson had retained Plaintiffs' counsel to represent him in connection with this lawsuit. (Johnson Dep. p. 107:1-7.) Given these facts conceded by Johnson, it is highly unlikely Fluellen would approach Johnson out of the blue and present the list. Furthermore, Johnson testified Fluellen also showed the list to "a few other folks" but did not identify any of them. (Id. at 77:22-24.) The record contains no identification of these "other folks," much less testimony from them affirming Fluellen showed them the list.

Third, Johnson claims the list had to represent loans issued the week of December 4, 2017, because he borrowed $20.00 that week and the list specifies this same amount for him. (Johnson Aff. ¶ 9; Johnson Dep. p. 131:5-12.) But when the questioning suggested this conclusion is faulty since Johnson borrowed $20.00 on other occasions, Johnson suddenly recalled there being a date of December 4, 2017, on the reverse side of the list. (Johnson Dep. p. 134:1-18.) His testimony concerning the date issue is sufficiently revealing of his credibility as to merit full recitation here:

> Q. So you'd agree with me then, wouldn't you, that this list could have made at any time prior to December 4th?
> A. No, I mean, because I know when I borrowed money, I didn't borrow money all the time, I borrowed some, but not all the time.
> Q. Yeah, I understand.
> A. After that, because like I said, we were getting our check.
> Q. But you told me earlier that there were weeks where you borrowed just $20.
> A. There were times I borrowed just $20.
> Q. So this list could, as far as you know, have been created from that week, couldn't it?
> A. That week of when?
> Q. When you borrowed $20 sometime prior to December 4th.
> A. Which week that was?
> Q. At any time.
> A. I'm saying this is the time, the last time that borrowed, I'm telling you the last time I borrowed.
> Q. Okay, I understand. But let's hypothetically, let's say that back in May 2017, and let's just pick the second week of May, I don't know if you borrowed any money that week or not, and at this point you probably don't remember whether you did or not, we'll just use that as an example. But let's say back in the second week of May 2017 that you only borrowed $20. Are you with me so far?
> A. I'm with you.
> Q. All right. This list that we're looking at right here could just as easily have been made, and kept, and lost, but generated the second week of May 2017, couldn't it?
> A. It could have.
> Q. Okay. Because this list isn't dated, right?

7

| | |
|---|---|
| A. | It--I--right. |
| Q. | You just know when it was found true? |
| A. | Right. |
| Q. | Not when it was made? |
| A. | Well, the date was on it, I just didn't take a picture of the date. |
| Q. | The date was on this list? |
| A. | It was on the back, I didn't take a picture of the date. |
| Q. | Why didn't you take a picture of the back? |
| A. | Because when he left and I looked at it, somebody else told me there was a date on the back of it, and I said, I didn't take no picture of the back. |
| Q. | Where is this list now? |
| A. | He gave it back the same day. |
| Q. | He gave it back to who? |
| A. | To James. |
| Q. | When you say he, who is he? |
| A. | Fluellen, Charlie Fluellen, he gave back to James the same day. |
| Q. | You saw the date? |
| A. | Yeah. |
| Q. | Did Mr. Fluellen take a picture of it? |
| A. | I don't know if he took a picture of it. |

(Id. at 132:9-134:20.)

Having already testified at length about the loan list, Johnson suddenly recalls a date on the reverse side when confronted with the obvious truth that the list's reference to him borrowing $20.00 does not, by itself, pinpoint the date. The problem then becomes explaining why he never bothered to take a picture of the reverse side. He first explains this failure by saying that, after Fluellen left Johnson's work area with the list, "somebody else" told Johnson there was a date on the back. Johnson never identifies the person who told him this. Just seconds later, however, Johnson testifies he personally saw the date on the reverse side of the list. The only circumstance that would reconcile these two contradictory statements is Fluellen returning to Johnson's work area to show him the list a second time, after the unidentified person told Johnson the date was on the back of the list. This

8

circumstance is never mentioned anywhere in Johnson's lengthy testimony nor anywhere else in the record.

Fourth, Akridge and Wilkerson testified they ceased all loan operations after receiving notice of the lawsuit on July 10, 2017. (Wilkerson Aff. ¶¶ 2, 5-6; Akridge Aff. ¶¶ 2, 6-7.) Three employees, two of whom appear on the loan list, submitted sworn statements confirming all loan operations ceased in July 2017. (Williams Aff.; R. Woods Aff.; T. Woods Aff.; doc. no. 65-2, Ex. A.) Five witnesses thus testified under oath concerning the July loan cessation, and the only evidence to suggest continuation of the loan program after July 2017 is the affidavit and deposition testimony of Johnson. Because Johnson's testimony is not credible, the evidence fails to show the loan scheme continued after July 2017, the loan list was created after July 2017, or the loan list was returned to Akridge after Johnson photographed it.

### C. Defendants Could Not Have Reasonably Known Plaintiffs Were Contemplating Litigation Until the Complaint Filing, Which Triggered the Duty to Preserve

It is undisputed that, prior to filing the complaint, Plaintiffs never provided Defendants with any threat of litigation, preservation letter, or other communication critical of the loan program or suggesting Plaintiffs were contemplating litigation. Plaintiffs argue Defendants should have reasonably anticipated litigation from inception of the loan program because it is an illegal payday loan scheme for which there are substantial criminal and civil penalties, citing Phillips v. Harmon, 774 S.E.2d 596 (Ga. 2015). As Plaintiffs concede, however, neither the Eleventh Circuit nor Georgia state courts have adopted such an all-encompassing duty to preserve.

9

Plaintiffs' argument also directly conflicts with Phillips, in which the court held the preservation duty is not triggered the moment a defendant commits an act or omission that is concerning enough to generate a fear of litigation. Id. at 604. Rather, a defendant's duty to preserve is triggered "when it knows or reasonably should know that the injured party, the plaintiff, is in fact contemplating litigation . . . ." Id. (citations omitted). When making this determination in the context of a plaintiff who did not issue any pre-suit notice of contemplated litigation, the court provided the following guidance:

> Notice that the plaintiff is contemplating litigation may also be derived from, i.e., litigation may be reasonably foreseeable to the defendant based on, other circumstances, such as the type and extent of the injury; the extent to which fault for the injury is clear; the potential financial exposure if faced with a finding of liability; the relationship and course of conduct between the parties, including past litigation or threatened litigation; and the frequency with which litigation occurs in similar circumstances. Thus, it may be appropriate to consider, in determining whether the defendant actually did or reasonably should have foreseen litigation by the plaintiff, not only what the plaintiff did or did not do after the injury and before the evidence in question was lost or destroyed, but also what the defendant did or did not do in response to the injury, including the initiation and extent of any internal investigation, the reasons for any notification of counsel and insurers, and any expression by the defendant that it was acting in anticipation of litigation.

Id. at 605.

Application of these factors here leads the Court to conclude Defendants could not have reasonably known Plaintiffs were in fact contemplating litigation before Plaintiffs filed and served the complaint. Unlike Phillips, there was no catastrophic event leading to serious injury or loss of life. The relationship and course of conduct between the parties did not suggest the employees planned litigation either. There is no evidence of any past litigation or threatened litigation. Litigation frequency in similar circumstances does not weigh heavily in favor of Defendants. An employee loan program is not widely known to the general

10

public as a frequent cause of litigation, and it is doubtful whether it is known as such even among employers or attorneys who do not specialize in labor and employment or finance. Any such frequency would undoubtedly pale in comparison to the frequency of litigation generated by car accidents, slip and falls, workplace injuries, and malpractice.

Nor is there any evidence Defendants were concerned about the prospect of litigation before the lawsuit began, such as notice to insurers or legal counsel or an internal investigation. In sum, nothing gave Defendants any indication Plaintiffs were contemplating filing suit before they received the complaint.

## III. CONCLUSION

For all of these reasons, the Court **FINDS** Defendants neither knew nor should have known Plaintiffs were in fact contemplating litigation prior to filing of the complaint and **DENIES** Plaintiffs' Motion for Sanctions. (Doc. no. 65.)

SO ORDERED this 11th day of July, 2018, at Augusta, Georgia.

BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA