# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### STATESBORO DIVISION

HAROLD H. RICKS; ROGER SMITH;
SHON BUTLER; and MALIK BRANTLEY,
Administrator of the Estate of Leroy
Brantley, Jr.,

        Plaintiffs,

    v.

HANDI-HOUSE MFG. CO.; and DONALD
FLANDERS,

        Defendants.

CIVIL ACTION NO.: 6:17-cv-89

## O R D E R

This matter comes before the Court on Defendants HandiHouse Manufacturing Company and Donald Flanders' Motions for Summary Judgment. (Docs. 87, 88.) The Court has reviewed the parties' briefs and supporting materials regarding Defendants' Motions. During that review, the Court resolved all factual disputes to Plaintiffs' benefit and construed the facts in Plaintiffs' favor. Even when affording Plaintiff those benefits, the Court finds that Defendants are entitled to judgment as a matter of law. To be clear, the Court does not condone the payday loan scheme at the core of Plaintiff's claims. However, no rational juror could find that HandiHouse Manufacturing Company or Donald Flanders participated in or profited from that scheme. Consequently, the Court **GRANTS** Defendants' Motions for Summary Judgment, (docs. 87, 88), and **DIRECTS** the Clerk of Court to **ENTER** a final judgment in favor of Defendants and to **CLOSE** this case.

## PROCEDURAL BACKGROUND

On June 29, 2017, Plaintiffs filed a putative class action against Handi-House Mfg. Co., Handi-House Financial Corporation, Handi-House Rent to Own, LLC, and employees Donald Flanders, James Akridge, John Wilkerson, Stephanie Flanders, and Brenda Williamson. (Doc. 1.) Alleging an illegal payday lending scheme within the manufacturing facility of Handi-House Mfg. Co., Plaintiffs initially asserted the following twelve causes of action: (1) a claim pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219, against all Handi-House entities for paying wages below the federal statutory minimum; (2) a claim pursuant to the Georgia Minimum Wage Law, O.C.G.A. § 34-4-6, against all Handi-House entities for paying wages below the state statutory minimum; (3) a claim pursuant to the Georgia Industrial Loan Act, O.C.G.A. §§ 7-3-1 to -29, against all Defendants for making payday loans of an amount under $3,000.00 without a license; (4) a claim pursuant to the Georgia Payday Lending Act, O.C.G.A. §§ 16-17-1 to -10, against all Defendants for making payday loans; (5) a common law conversion claim against all Defendants; (6) a claim pursuant to O.C.G.A. § 7-4-1 against all Defendants for making usurious loans; (7) a claim pursuant to 18 U.S.C. §§ 1581, 1593A, and 1595 against all Defendants for holding Plaintiffs in debt servitude; (8) a claim pursuant to the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), (d), against all individual defendants for conspiring and participating in the unlawful collection of debt; (9) a claim pursuant to the Georgia RICO Act, O.C.G.A. § 16-14-1, against all individual defendants for conspiring and participating in racketeering activities; (10) a claim pursuant to 42 U.S.C. § 1981 against all Handi-House entities for civil rights violations and racial discrimination; (11) a claim pursuant to O.C.G.A. § 41-2-1 against all Defendants for creating a public nuisance; and (12) a claim for punitive damages under O.C.G.A. § 51-12-5.1.

(Id.)

On July 27, 2018, the Court denied Plaintiffs' motion for a collective action class under FLSA because Plaintiffs failed to show there are employees similarly situated to Plaintiffs who wish to opt into a class action. (Doc. 109.) The Court denied Plaintiffs' motion to certify a class under Federal Rule of Civil Procedure 23 because Plaintiffs did not identify an administratively feasible method for identifying class members. (Id.)

On February 19, 2018, Plaintiffs moved for sanctions, arguing James Akridge and John Wilkerson, as agents of Handi-House, perpetrated the loan scheme and intentionally destroyed lists of employee loans. (Docs. 65, 65-1.) On May 15, 2018, pursuant to stipulation of the parties, the Court dismissed without prejudice all defendants except Mr. Flanders and Handi-House Mfg. Co. ("Handi-House") as well as the following two causes of action: (1) the claim in count seven, brought pursuant to 18 U.S.C. §§ 1581, 1593A, and 1595, alleging conditions of debt servitude; and (2) the claim in count ten brought pursuant to 42 U.S.C. § 1981. (Doc. 85.)

On July 11, 2018, the Court denied Plaintiffs' Motion for Sanctions because Plaintiffs failed to carry their burden of proving Mr. Flanders and Handi-House destroyed any loan lists. (Docs. 106.) On July 28, 2018, Plaintiffs requested reconsideration, and the Court conducted an evidentiary hearing on October 30, 2018. (Docs. 108, 126, 132.) On November 28, 2018, the Court again denied the sanctions Motion, even though the testimony established intentional destruction of at least one loan list by Messrs. Akridge and Wilkerson, because Messrs. Akridge and Wilkerson were no longer Defendants and there was no evidence of any involvement in the loan scheme or spoliation by Handi-House and Mr. Flanders. (Doc. 131.)

## FACTUAL BACKGROUND

The Court gleans the following facts from Defendants' Statements of Material Facts,

Plaintiffs' response, and the evidentiary record. Handi-House manufactures portable storage buildings in Swainsboro, Georgia, employing approximately 150 workers, and sells them to retailers throughout the Southeast. (Flanders Aff., doc. 87-3, ¶¶ 3, 8; Handi-House Dep., doc. 87-14, pp. 11-13.) Defendant Don Flanders purchased Handi-House in 1979 and is Chief Executive Officer ("CEO"). (Flanders Dep., doc. 87-8, p. 7.) Two former Defendants are related Handi-House companies. Formed in 1987, Handi-House Financial Corporation issues consumer loans to purchasers of Handi-House portable storage buildings. (Flanders Aff. ¶¶ 4, 5.) Formed in 2009, Handi-House Rent-To-Own, LLC, sells consumer goods on a rent-to-own basis in retail sales lots throughout the Southeast. (Id. at ¶¶ 6, 7.) Plaintiffs are current and former employees of Handi-House who earned hourly wages at the manufacturing facility within the range of $7.25 to $9.00 during the period of approximately 2013 to 2018. (Butler Dep., doc. 87-6, pp. 20-21, 31; Williamson Aff., doc. 87-15, ¶ 3; Smith Dep., doc. 87-5, p. 18; Ricks Dep., doc. 87-7, p. 24; Brantley Dep., doc. 87-4, p. 87; Brantley Aff., doc. 96-2, ¶ 7.)

It is undisputed Messrs. Akridge and Wilkerson issued payday loans to Plaintiffs and other employees at the manufacturing facility, typically charging an exorbitant fee of six dollars for every twenty dollars borrowed. (Wilkerson Dep., pp. 37-38; Brantley Aff. ¶ 4; Ricks Aff., doc. 96-3, ¶ 4.; Smith Aff., doc. 96-4, ¶ 4; Butler Dep., p. 50.) James Akridge has worked at Handi-House for forty years and is currently a sales and general manager with an annual salary of $59,020.00. (Akridge Dep., doc. 87-10, p. 7; doc. 103-2, p. 2; Handi-House Dep., p. 18; doc. 87-13, ¶ 5.) John Wilkerson, now deceased, worked at Handi-House for thirty-three years and last served as Plant Manager with an annual salary of $39,100.00. (Wilkerson Dep., doc. 87-11, pp. 9-10; Thompson Economic Report, doc. 63, p. 1.) Messrs. Akridge and Wilkerson used their

own money to fund their loan scheme[1] and split all profits. (Akridge Dep., p. 37; Wilkerson Dep., pp. 37-38, 44; Ricks Dep., p. 81.) As Plaintiffs' counsel conceded at the sanctions hearing, the loan scheme was a side venture by Messrs. Akridge and Wilkerson, and neither Handi-House nor Mr. Flanders participated in nor profited from it. (Sanctions Hr'g Tr., doc. 132, pp. 19-20.)

Messrs. Akridge and Wilkerson collected loan payments on payday. (Butler Dep., pp. 39-40.) Brenda Williamson, the payroll clerk, typically asked Mr. Akridge to sign paychecks because he was always at the plant and Mr. Flanders was frequently on Handi-House business trips. (Williamson Dep., p. 19; Handi-House Dep., pp. 19-20.) Ms. Williamson distributed the signed paychecks to department heads, and they distributed the checks to their employees. (Williamson Dep., pp. 19-20.) However, when Ms. Williamson separated the checks by department, she made a separate pile for employees listed on a sheet of paper given to her by Mr. Wilkerson. (Doc. 58-2, p. 10; Wilkerson Dep., pp. 45-46; Williamson Dep., pp. 23-29.)

The list contained the names of employees who owed Messrs. Akridge and Wilkerson money, but Ms. Williamson did not understand this or know why Mr. Wilkerson asked her to separate the checks of these employees. (Wilkerson Dep., pp. 45-46; Williamson Dep., pp. 23-29.) Messrs. Akridge and Wilkerson delivered the segregated checks to their debtor employees for endorsement, cashed the endorsed checks at the bank, paid themselves the loan balances, and remitted the remaining cash, minus any change, to the debtor employees. (Butler Dep., pp. 39-40; Akridge Dep., pp. 23-24; Smith Dep., pp. 127-28; Brantley Dep., p. 64.)

Mr. Flanders was generally aware Messrs. Akridge and Wilkerson issued loans to Handi-

---

[1] Plaintiffs attempted to dispute this fact by pointing to a 2012 loan from Handi-House to Mr. Akridge for $12,000.00 to allow Mr. Akridge to move his house to another property. (See doc. 95-1, p. 2; Handi-House Dep., pp. 52-53.) There is no evidence of any ulterior motive for this loan or use of the proceeds of this loan to fund the payday loan scheme.

House employees but testified he did not know the loan terms, i.e., the six-dollar fee for every twenty dollars borrowed, until the filing of this lawsuit. (Flanders Dep., pp. 37-45, 58; Williamson Dep., p. 23.) He did not inquire because he believed it was not his business. (Id. at 40, 45.) Immediately upon receipt of the lawsuit, Mr. Flanders "instructed Akridge and Wilkerson that they were to discontinue all lending activities on [Handi-House] property." (Flanders Aff. ¶¶ 26-28.)

Plaintiffs contend Mr. Flanders knew about the exorbitant fees charged by Messrs. Akridge and Wilkerson. (Doc. 95, pp. 4-9.) The only evidence Mr. Flanders knew about loan terms is the testimony of Mr. Leroy Brantley, who testified he complained to Mr. Flanders a long time ago, in the 1990s, about the high loan fees Mr. Akridge charged him. (Brantley Dep., pp. 52-55.) Mr. Flanders purportedly responded, "he didn't have nothing to do with it." (Id. at 53.) Notably, Mr. Harold Ricks testified he told Mr. Flanders on an unknown date Mr. Akridge was taking his money and was "wrong for it." (Ricks Dep., pp. 97, 109-10.) In response, Mr. Flanders issued Mr. Ricks an interest-free loan and advised him to leave Messrs. Akridge and Wilkerson alone. (Id. at 110.)

Prior to the lawsuit, Mr. Flanders recalled two or three occasions when employees complained to him they needed their paychecks to pay bills but owed Messrs. Akridge and Wilkerson too much money. (Flanders Dep., p. 39.) On each such occasion when an employee complained, Mr. Flanders informed the employee he or she should always receive their paycheck, and he instructed Messrs. Akdrige and Wilkerson any employee who "wants their check[,] they get the check." (Id. at 39-42.) Any time this issue was presented to Mr. Flanders, he instructed Messrs. Akridge and Wilkerson "at no time do you hold this person's check." (Id. at 40.) This is consistent with the testimony of Plaintiff Roger Smith, who recalled one occasion

when Mr. Flanders observed employees lining up in front of Messrs. Akridge and Wilkerson on payday. (Smith Dep., pp. 106-07.) Mr. Smith overheard Mr. Flanders instruct Messrs. Akridge and Wilkerson to "cut that out, clear that out" because "I don't want this in my plant." (Id. at 106.) Mr. Smith believes the conversation concerned the loan scheme. (Id. at 107.)

In stark contrast to Messrs. Akridge and Wilkerson, Mr. Flanders has personally loaned money to Handi-House employees without charging interest or fees, and "in most instances, [he] never required them to pay . . . back the principal . . . ." (Flanders Aff. ¶ 23.) In addition, Mr. Flanders operates a zero-interest, no-fee loan program at Handi-House whereby employees can borrow $100 or $200, depending on seniority, that is repaid "by payroll deductions upon repayment terms decided by the borrowing employee." (Id. ¶ 24; Fluellen Dep., doc. 78-2, pp. 25-27.)

Messrs. Ricks and Brantley testified Messrs. Akridge and Wilkerson sometimes pressured them to borrow money. Mr. Ricks testified Mr. Wilkerson might, for example, assign him work in the hot sun if he did not borrow money. (Ricks Dep., pp. 29-30.) Mr. Brantley testified he was not forced to take loans, but that it "would be put in a way that you have to sometimes." (Brantley Dep., p. 63.) Messrs. Smith and Shon Butler testified Messrs. Akridge and Wilkerson never pressured or forced them to borrow money. (Smith Dep., pp. 122-24; Butler Dep., p. 53.) Mr. Ricks also testified Mr. Akridge suspended him for one week, then terminated his employment, because of an argument that occurred when Mr. Ricks refused to surrender his paycheck to Mr. Akridge for repayment of a loan. (Ricks Dep., pp. 23-24.)

Plaintiffs generally allege they received loans from Messrs. Akridge and Wilkerson on a weekly basis during their employment. (Smith Dep., p. 61.; Butler Dep., pp. 96-97; Ricks Dep., pp. 146-47; Smith Aff. ¶ 6.; Ricks Aff. ¶ 6; Smith and Ricks Paystubs, doc. 40-20, pp. 41-109.)

While the loan scheme did not involve any formal loan documentation, Handi-House and its bank have produced paychecks confirming Plaintiffs endorsed paychecks to Mr. Akridge for him to cash. (Brantley Dep., p. 47; Smith Dep., p. 35; doc. 87-9, pp. 9, 22; Peil Aff., doc. 96-5 (summarizing Plaintiffs' pay stubs and dual endorsed payroll checks).) Plaintiffs' counsel reviewed the paychecks and determined Messrs. Akridge and Wilkerson cashed 102 checks for Mr. Butler totaling $25,432.44, seventy-nine checks for Mr. Ricks totaling $16,949.47, and 121 checks for Mr. Smith totaling $22,186.07. (Peil Aff., pp. 22-29.) There is no documentation showing how much money each Plaintiff borrowed. Mr. Ricks testified he borrowed roughly $50 to $70 per week, Mr. Smith testified he borrowed $20 to $180 per week, and Mr. Butler testified he borrowed roughly sixty to $100 per week. (Ricks Dep., pp. 88-89; Smith Aff. ¶ 6; Butler Dep., p. 49.)

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party must identify the portions of the record which establish that there are no "genuine

dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011). When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)). However, "facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (citation and emphasis omitted).

## DISCUSSION

## I.    There is No Federal Minimum Wage Violation Because Handi-House Delivered Compliant Paychecks and Received No Benefit from the Loan Scheme, and the Georgia Minimum Wage Law Does Not Apply

Even though Handi-House's payroll practices complied with the minimum wage requirement of FLSA, Plaintiffs assert Handi-House is liable because the cash loan payments

Plaintiffs voluntarily made to Messrs. Akridge and Wilkerson after delivery of their paychecks reduced their net pay below the minimum wage. (Doc. 1, p. 11.) FLSA requires employers to pay a minimum wage that is currently $7.25 per hour. 29 U.S.C. § 206(a)(1)(C). Payroll deductions in the following three categories may reduce wages below the minimum without constituting a statutory violation: (1) taxes assessed against the employee and forwarded to the appropriate governmental agency, pursuant to 29 C.F.R. § 531.38; (2) payments an employer is legally obligated to make by court order to a creditor for the benefit or credit of the employee, pursuant to 29 C.F.R. § 531.39; and (3) deductions an employee directs an employer to make for the benefit of the employee to a "creditor, donee, or other third party," provided "neither the employer nor any person acting in his behalf or interest, directly or indirectly, derives any profit or benefit from the transaction," pursuant to 29 C.F.R. § 531.40.

In the Eleventh Circuit, a judicially recognized exception permits payroll deductions benefitting the employer to repay wages advanced freely and clearly before payday. Brennan v. Veterans Cleaning Serv., Inc., 482 F.2d 1362, 1369 (5th Cir. 1973).[2] Finally, and most relevant here, FLSA requires employers to pay the minimum wage finally and unconditionally with no kick-backs benefitting the employer, as explained in 29 C.F.R. § 531.35:

> Whether in cash or in facilities, "wages" cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or "free and clear." The wage requirements of the Act will not be met where the employee "kicks-back" directly or indirectly to the employer or to another person for the employer's benefit the whole or part

---

[2] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions that were handed down prior to the close of business on September 30, 1981.

of the wage delivered to the employee. This is true whether the "kick-back" is made in cash or in other than cash.

The record is devoid of any suggestion Handi-House violated FLSA in any respect, such as by failing to pay the minimum wage, taking improper payroll deductions, delivering conditional paychecks, or receiving any "kick-backs" from the loan scheme payments. Plaintiffs do not argue otherwise, but instead argue the purely personal actions of Messrs. Akridge and Wilkerson after Handi-House's delivery of the paychecks constitute FLSA violations for which Handi-House is vicariously liable. (Doc. 96, pp. 6-12.) The three arguments Plaintiffs advance in support of this argument are not persuasive.

First, Plaintiffs contend Handi-House is liable for the personal misdeeds of Messrs. Akridge and Wilkerson because FLSA broadly defines "employer" as including "both the employer for whom the employee directly works as well as 'any person acting directly or indirectly in the interest of an employer in relation to an employee.'" Lamonica v. Safe Hurricane Shutters, Inc., 711 F.3d 1299, 1309 (11th Cir. 2013) (quoting Josendis v. Wall to Wall Residence Repairs, Inc., 662 F.3d 1292, 1298 (11th Cir. 2011)). The definition does not apply here because Messrs. Akridge and Wilkerson acted solely in their own interests when they conducted the loan scheme in relation to employees, and not directly or indirectly in the interest of Handi-House. No reasonable juror could find otherwise, even when the evidentiary record is viewed in a light most favorable to Plaintiffs.

Just as importantly, the purpose of this broad definition is to extend liability to a corporate officer for FLSA wage violations of the company where the officer exercised operational control in a manner that justifiably leads to personal liability. Id. at 1310; see also Patel v. Wargo, 803 F.2d 632, 637-38 (11th Cir. 1986) (holding corporate officers liable

for company FLSA violations because their actions caused wages to drop below minimum).

Plaintiffs do not cite, and the Court cannot find, any provision of FLSA or any court decision suggesting liability flows in the opposite direction, i.e., that purely personal activities of a manager, in personal dealings with other employees, can extend liability to the company that has fully complied in all respects with FLSA.

Second, Plaintiffs cite Walling v. Peavy-Wilson Lumber Co., 49 F. Supp. 846 (W.D. La. 1943), for the proposition an employer is liable under FLSA for loan payments made by employees to a loan company that is closely affiliated with the employer. A close reading of this historic, lengthy decision dispels any notion of it supporting a finding of liability against Defendants. Since its inception in 1938, just five years before Walling, FLSA has provided as follows: "'Wage' paid to any employee includes the reasonable cost, as determined by the Administrator, to the employer of furnishing such employee with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees." 29 U.S.C. § 203(m). The employer in Walling was a large lumber company that operated a company-owned town complete with 265 tenant houses, a large general store, and several churches. Walling, 49 F. Supp. at 854.

The core issue was the propriety under FLSA of counting as wages the reasonable cost of a wide array of services and goods provided by the company, including goods purchased at the general store, rental housing, water service, and medical services. The court construed the phrase "or other facilities" in § 203(m) "to include the relation[ship] of landlord and tenant, and merchant and customer . . . ." Id. at 861. The vast majority of the fifty-page decision considers this issue of statutory construction, and relatedly whether the

amount of wages calculated by the employer for these services and goods reflected its actual and reasonable costs. See generally id.

Near the end, however, the court addresses the propriety of payroll deductions, authorized by employees, to pay loans issued to them by an investment company founded by two of the employer's bookkeepers, one of whom was the son of the employer's vice president. Id. at 890. Many investors in this venture worked for the employer. Id. The court's analysis is succinct and provides in full as follows:

> Since this corporation has discontinued business and is in process of liquidation, we need not devote more attention to this phase of the case than to say that where the laborers are paid the bare minimum wage, it is an infringement of the Act and of the Regulations thereunder to operate such an investment company in this manner and with the clerical forces interconnected as narrated, but we see no need for or purpose of the issuance of an in injunction in any degree.

Id. Were the issue not rendered entirely moot by the lending company's liquidation, the Walling court would have undoubtedly explained the statutory and regulatory underpinnings of its conclusion. Nonetheless, the Court is confident that, if presented with the facts sub judice, the Walling court would find no FLSA liability because, unlike the payroll deductions at issue in Walling, it is undisputed Handi-House delivered paychecks "free and clear" to Plaintiffs without any deductions for the loan scheme operated by Messrs. Akridge and Wilkerson.

Citing Walling, Plaintiffs appear to argue payments inuring to the personal benefit of Messrs. Akridge and Wilkerson should nonetheless be treated as payments benefitting Handi-House because the "clerical forces" are "interconnected." (See doc. 96, p. 10.) However, FLSA and its implementing regulations contain no support for such a conclusion. Instead, 29 C.F.R. § 531.35 prohibits "'kicks-backs' directly or indirectly to the employer or

to another person for the employer's benefit . . . ."  It is undisputed the cash loan payments were never received directly or indirectly by Handi-House, and Messrs. Akridge and Wilkerson did not receive the cash loan payments for Handi-House's benefit.  (Akridge Dep., p. 37; Wilkerson Dep., p. 44; Sanctions Hr'g Tr., pp. 19-20.)

Plaintiffs mention other decisions citing <u>Walling</u> favorably, undoubtedly to assuage any anxiety over the decision's considerable age, but none of the cases cited by Plaintiffs contain any discussion of the *dicta* in <u>Walling</u> concerning payroll deductions for loan payments.  <u>See</u> <u>Anderson v. Mt. Clemens Pottery Co.</u>, 328 U.S. 680, 691-92 (1946) (distinguishing commute time from factory in <u>Walling</u> to travel time required by employer's business in assessing FLSA violation); <u>Davis Bros., Inc., v. Donovan</u>, 700 F.2d 1368, 1370-71 (11th Cir. 1983) (discussing deduction of wages based on reasonable cost of meal); <u>Davis Bros., Inc., v. Marshall</u>, 522 F. Supp. 628, 631 (N.D. Ga. 1981) (citing legislative history in <u>Walling</u> while discussing reasonable cost of food and lodging).

Finally, Plaintiffs contend Handi-House indirectly benefitted from the loan scheme "in the form of reduced salaries for its managers [Messrs. Akridge and Wilkerson] and increased productivity from a workforce trapped in a cycle of debt repayment to the company . . . ."  (Doc. 96, p. 11).  With respect to the former, Plaintiffs allege Defendants allowed the loan scheme to continue "because it was good side money for Akridge and Wilkerson," and allowing this "extra source of income was cheaper than paying them the market wages they deserved."  (<u>Id.</u> at 10.)  In support, Plaintiffs cite their expert economist, Mark A. Thompson, Ph.D., who finds the annual salaries of Messrs. Akridge and Wilkerson fell within the 25th percentile of similar occupations in east Georgia.  (Doc. 63.)  The implication, apparently, is

Defendants could not have recruited and maintained a stable work force of managers such as Messrs. Akridge and Wilkerson but for the profits generated by the loan scheme.

Absent from the record is any statement by Messrs. Akridge or Wilkerson (or any other fact witness) suggesting that, but for profits from the loan scheme, they would have left Handi-House for higher paying jobs. Nor do Plaintiffs explain how twenty-five percent of other companies in the same region manage to survive despite paying similar or smaller salaries to their managers. Furthermore, Defendants provided objective evidence Mr. Akridge earns $59,020.00 annually, which puts him above the fiftieth percentile according to Dr. Thompson's calculations. (Doc. 103-2, p. 2; <u>see</u> Thompson Economic Report, p. 3.) Lastly, there is no evidence Handi-House knew of the profits realized by the loan scheme and decided to pay lower salaries to Messrs. Akridge and Wilkerson as a result. (Flanders Dep., pp. 40, 58.) Such rank speculation and wide gaps in logic fall far short of proof that Defendants benefitted from the loan scheme.

The latter argument is no more persuasive. Employees were not "trapped in a cycle of debt to the company." (<u>See</u> doc. 96, p. 11.) Employees borrowed money from Messrs. Akridge and Wilkerson, not Handi-House, and the Court can discern no benefit to Handi-House from employees being trapped in a cycle of debt to Messrs. Akridge and Wilkerson. While one might speculate employees would feel beholden to show up for work to repay the loans, an equally speculative argument can be made that owing money to Messrs. Akridge and Wilkerson would incentivize employees to leave Handi-House and escape the loan scheme. Nor is there any evidence in the record to support Plaintiffs' peculiar claim that workers trapped in a debt cycle increase productivity. Furthermore, it is undisputed Mr.

Flanders assisted employees in financial straits by issuing them zero-interest, no-fee loans out of his own pocket and through Handi-House.  (Flanders Aff. ¶ 23.)

Plaintiffs have simply pointed to no evidence to support their theories as to how Handi-House benefited from Messrs. Akridge and Wilkerson's loan scheme.  For the above reasons, Handi-House is entitled to summary judgment with respect to Plaintiffs' FLSA claim. Relatedly, Plaintiffs request leave to amend to add a FLSA claim against Mr. Flanders. (Doc. 96, p. 9.)  The Court denies leave to amend because it is untimely.  <u>See</u> Fed. R. Civ. P. 15; <u>Linares v. Broward Cty. Sheriff's Off.</u>, 347 F. App'x 424, 428 (11th Cir. 2009) (finding prejudicial filing of amended complaint after summary judgment motions).  An amendment would also be futile for the same reasons discussed above with respect to Handi-House.

Plaintiffs assert an alternate claim under the Georgia Minimum Wage Law, O.C.G.A. § 34-4-3, but this code section states it does not apply to employers that are subject to the minimum wage provisions of FLSA.  FLSA applies to employees "who in any workweek [are] engaged in commerce or in the production of goods for commerce, or [are] employed in an enterprise engaged in commerce or in the production of goods for commerce." 29 U.S.C. § 206(a).  Under FLSA, an employee is "deemed to have been engaged in the productions of goods if such employee was employed in . . . manufacturing." <u>Id.</u> § 203(j).  Because it is undisputed Handi-House produces goods for commerce and employed Plaintiffs in such manufacturing, FLSA applies to the exclusion of § 34-4-3.  (<u>See</u> Flanders Aff., doc. 87-3, ¶¶ 3, 8.)

**II.    The Federal and Georgia RICO Claims Fail Because Handi-House Was Not an Enterprise Collecting Unlawful Debt, and Mr. Flanders Never Participated in the Loan Scheme**

Plaintiffs brought federal RICO claims under 18 U.S.C. § 1962 (c) and (d) against Mr. Flanders individually, alleging he oversaw collection of unlawful debt and conspired with others to do so.  (Doc. 1, pp. 16-17.)  Section 1962(c) provides it is unlawful for a "person employed by or associated with any enterprise engaged in . . . interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through . . . collection of unlawful debt."   Subsection 1962(d) prohibits conspiracies to violate subsection (c).  The elements of a § 1962(c) claim are as follows:  (1) existence of an enterprise affecting interstate or foreign commerce; (2) the defendant's association with the enterprise; (3) the defendant's participation in or conducting of the enterprise's affairs; and (4) the defendant's participation in or conduct of the enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.  United States v. Goldin Indus., Inc., 219 F.3d 1271, 1274 (11th Cir. 2000).  Plaintiffs cannot prove the fourth prima facie element for two reasons because (1) Mr. Flanders never participated in the loan scheme and (2) Handi-House was never used as a vehicle for collection of unlawful debt.

First, Mr. Flanders never participated in the loan scheme.  Plaintiffs claim in their brief Handi-House "was a legitimate enterprise which RICO co-conspirator Donald Flanders managed and used to facilitate loan-sharking over several decades."  (Doc. 95, p. 7.)  On the other hand, however, Plaintiffs' counsel conceded during the sanctions hearing neither Handi-House nor Mr. Flanders participated in or profited from the loan scheme, which was a personal side venture of Messrs. Akridge and Wilkerson.  (Sanctions Hr'g Tr., pp. 19-20.)

To illustrate why they believe the evidence is sufficient to establish Mr. Flanders's

participation, Plaintiffs cite <u>Jaguar Cars, Inc. v. Royal Oaks Motor Cars Co.</u>, 46 F.3d 258 (3rd Cir. 1995), wherein a Jaguar car dealership engaged in a massive scheme to bilk the auto manufacturer by submitting fraudulent warranty claims. In total, the dealership defrauded Jaguar of an amount between $1 million and $2 million, "enabling [the dealership] to generate hundreds of thousands of dollars of warranty income per month and to maintain extremely lucrative salaries for the defendants through periods of declining sales even though its work bays were often empty and its technicians idle." <u>Id.</u> at 261. Jaguar won at trial, and the Third Circuit affirmed judgment in favor of Jaguar against the dealership and the father and two sons who owned and managed the dealership. <u>Id.</u>

The father contended on appeal he could not be held liable because he did not commit any predicate acts of mail fraud and did not aid or abet anyone in the commission of such acts. <u>Id.</u> at 260. The Third Circuit disagreed and found evidence sufficient to support the jury verdict because (1) aiding and abetting may be proven by circumstantial evidence showing the father knew of the commission of the acts and acted with intent to facilitate it; and (2) jurors had sufficient circumstantial evidence because of the breadth and scope of the fraudulent scheme, the widespread knowledge of the scheme throughout the dealership, the father's active involvement and management of the dealership, and his significant income from the dealership despite small and declining sales. <u>Id.</u> at 270. Simply stated, the warranty scheme generated massive amounts of revenue for a dealership with little actual revenue, and the father was too intimately involved in the dealership's daily affairs and compensated all too well from the immense profits generated by the scheme, to have a legitimate claim he did not know and did nothing to facilitate the scheme. <u>Id.</u> at 271.

The facts at issue *sub judice* are a study in contrast to <u>Jaguar Cars</u>. The record is

devoid of evidence Mr. Flanders committed any act with intent to facilitate the loan scheme. No reasonable juror could conclude there is enough circumstantial evidence of his involvement either. Mr. Flanders never profited from the loan scheme, and his actions as CEO could not have facilitated a loan scheme that occurred outside the framework of Handi-House's operations.

Plaintiffs also claim Mr. Flanders is liable as a co-conspirator under § 1962(d), arguing he is "equally liable" with Messrs. Akridge and Wilkerson "regardless of whether [he] played an immediately active part in the violation or only participated in the conspiracy through normal means." (Doc. 95, p. 5.) The problem with this theory, however, is Plaintiffs failed to present any evidence suggesting Mr. Flanders was a willing participant in the loan scheme. See O'Malley v. O'Neill, 887 F.2d 1557, 1560 (11th Cir. 1989) (affirming dismissal of RICO conspiracy claim because complaint alleged no facts indicating defendants were willing participants in conspiracy). There is no evidence Mr. Flanders knowingly and willfully agreed to become a member of the loan scheme conspiracy. Nor is there any circumstantial evidence his words and actions objectively manifested an agreement to participate in the loan scheme. See Hall v. White, No. 07-S-484-NW, 2008 WL 11380043, at *10 (N.D. Ala. Mar. 11, 2008) (holding complaint failed to state civil RICO claim because it did not allege knowing and willful agreement to become member of conspiracy or circumstantial evidence objectively manifesting agreement to participate).

Second, Plaintiffs cannot satisfy the fourth prima facie element because no reasonable juror could find Handi-House was used as a vehicle for collection of unlawful debt, or the conduct of its affairs involved collection of unlawful debt. Instead, the only relationship between the loan scheme and Handi-House is merely geographical, which does not state a

federal RICO claim. United States v. Dennis, 458 F. Supp. 197, 198 (E.D. Mo. 1978). One need look no further than the analogous case of Dennis, wherein the government charged an employee of General Motors Corporation with violating § 1962(c) by unlawfully collecting debts "incurred by fellow employees at the General Motors Assembly Division as a result of allegedly borrowing funds at usurious rates . . . ." Id. at 197. The Court dismissed the RICO charge *sua sponte*, reasoning "[t]he mere fact that defendant is employed by the enterprise and collects unlawful debts on the premises of the enterprise . . . does not establish that the defendant participated in the conduct of the enterprise's affairs through the collection of the debts." Id. at 199. The basis for dismissal is even stronger here because Mr. Flanders did not participate in the loan scheme while the defendant in Dennis was the loan scheme perpetrator.

Without evidence of the enterprise being used as a vehicle for the unlawful conduct, a RICO claim cannot survive summary judgment. See Sun v. Giardot, 237 F. App'x 415, 418 (11th Cir. 2007) (affirming summary judgment to defendant on federal RICO claim because company alleged to be enterprise "was not a vehicle for any crime"); United States v. Goldin, 219 F.3d 1271, 1275 (11th Cir. 2000) (explaining "definitive factor" in determining existence of RICO enterprise is existence of association, formal or informal, that furnishes vehicle for unlawful conduct). Notably, a good faith argument may exist that Messrs. Akridge and Wilkerson created their own informal "association in fact" enterprise to conduct the loan scheme. Plaintiffs do not make this assertion, most likely because it is undisputed Mr. Flanders was not involved with such an enterprise.

Summary judgment is proper with respect to the Georgia RICO claim for the same reasons stated above concerning the federal RICO claim. The Georgia statute "mirrors" the

federal statute "in both purpose and language . . . ."  <u>Williams Gen. Corp. v. Stone</u>, 614

S.E.2d 758, 760 (Ga. 2005).  Plaintiffs admit Georgia's RICO statute is substantially similar

to the federal RICO statute, and Plaintiffs cite no additional Georgia case law to support

liability.  (Doc. 95, p. 13.)

### III.   Plaintiffs' Claims Under the Georgia Payday Lending Act and Industrial Loan Act Fail Because Defendants Are Not Vicariously Liable for the Purely Personal Misdeeds of Messrs. Akridge and Wilkerson

Plaintiffs do not allege Defendants committed any acts in violation of Georgia's

Payday Lending Act, O.C.G.A. §§ 16-17-1 to -10 ("GPLA") or Industrial Loan Act,

O.C.G.A. §§ 7-3-1 to -29, ("GILA").  Nor could they in good faith.  Both Acts expressly limit

their application to persons or entities issuing prohibited loans except for GPLA's extension

to "de facto lenders" for "agents" who possess a "predominant economic interest in the

revenues generated by the loan."  O.C.G.A. § 16-17-2(b)(4).  It is undisputed Defendants

never issued any such prohibited loans, were not in the business of doing so, and never

possessed any economic interest in loans issued by Messrs. Akridge and Wilkerson.

O.C.G.A. §§ 7-3-2, 16-7-2.  Plaintiffs do not contend otherwise, but instead argue (1) Handi-

House is vicariously liable under the *respondeat superior* doctrine because Messrs. Akridge

and Wilkerson were acting within the course and scope of their employment when they

operated the loan scheme, (doc. 96, pp. 15-20); and (2) Mr. Flanders is liable "as a co-

conspirator, and aider and abetter, or as a procurer of harm," (doc. 95, pp. 3-4).  Neither

argument has merit.

Under Georgia law, merely placing an employee in a position to commit torts during

their regular job duties is not a basis for vicarious liability if the tortious act is not in

furtherance of or within the scope of the business.  <u>Piedmont Hosp., Inc. v. Palladino</u>, 580

S.E.2d 215, 217-18 (Ga. 2003). "If a tortious act is committed not in furtherance of the employer's business, 'but rather for *purely personal reasons* disconnected from the authorized business of the master, the master is not liable.'" Id. at 217 (quoting Lucas v. Hosp. Auth. of Dougherty Cty., 388 S.E.2d 871, 873 (Ga. App. 1989)). "Stated another way, if the employee was authorized to accomplish the purpose in pursuance of which the tort was committed, the employer is liable." Chorey, Taylor & Feil, P.C. v. Clark, 539 S.E.2d 139, 140 (Ga. 2000) (citations omitted).

Examples abound of Georgia courts steadfastly applying this bright line rule to find no vicarious liability for unauthorized acts of a purely personal nature. See, e.g., Bennett v. United States, 102 F.3d 486, 489 (11th Cir. 1996) (applying Georgia law, finding United States not vicariously liable for soldier who discharged personal gun while in Army barracks discussing social plans); Roberts v. Duco Dev., Inc., 494 S.E.2d 313, 314-15 (Ga. Ct. App. 1997) (refusing to impute liability to restaurant for manager who falsely reported theft of restaurant funds by employee because manager was motivated by purely personal reasons); Worstell Parking, Inc. v. Aisida, 442 S.E.2d 469, 470–71 (Ga. Ct. App. 1994) (refusing to hold employer liable for parking attendant who struck customer with stick because altercation was purely personal and not for any purpose beneficial to defendant); Gooden v. Day's Inn, 395 S.E.2d 876, 879 (Ga. Ct. App. 1990) (finding hotel not vicariously liable for employee theft of money converted to his own use); Wallace v. ARA Serv., Inc., 365 S.E.2d 461, 463 (Ga. Ct. App. 1988) (holding employer not liable for injuries resulting from employee's unauthorized use of company van for personal errands); Wittig v. Spa Lady, Inc. of Marietta, 356 S.E.2d 665, 666 (Ga. Ct. App. 1987) (finding no vicarious liability where employee of day spa forged signature of plaintiff onto contract after unsuccessfully soliciting

plaintiff's business because forging signature of purported customer to company contract was not within scope of employment).

No reasonable juror could find that Defendants authorized Messrs. Akridge and Wilkerson to conduct the loan scheme, that Messrs. Akridge and Wilkerson conducted the loan scheme in furtherance of Handi-House's business, or that they conducted the loan scheme within the scope of their positions as managers. Plaintiffs merely point to Mr. Akridge's ability to ensure payment by delivering payroll checks to borrowers for endorsement and cashing, but Defendants are not liable merely because they placed Messrs. Akridge and Wilkerson in position as managers and they used that position to commit torts during their regular job duties. Indeed, the undisputed evidence shows Messrs. Akridge and Wilkerson perpetrated the loan scheme for purely personal reasons disconnected from the authorized business of Handi-House.

Likewise, Mr. Flanders is not liable as a co-conspirator, aider and abetter, or as a procurer of harm. Even assuming GPLA and GILA contemplate vicarious liability in this manner as Plaintiffs contend, the record is absent of any evidence showing Mr. Flanders conspired with Messrs. Akridge and Wilkerson, aided and abetted the loan scheme, or procured the injuries allegedly caused by the loan scheme. Plaintiffs argue for application of O.C.G.A. § 51-12-30, but it expressly applies only when "a person . . . maliciously procures an injury to be done to another . . . ." There is no evidence of such malicious procurement by Mr. Flanders. Plaintiffs claim Georgia courts broadly apply § 51-12-30 to any "interference done without legal justification" when the defendant has merely provided assistance in the form of "advice, counsel, or persuasion." (Doc. 95, p. 15.) Even assuming Plaintiffs are

correct, there is no evidence Mr. Flanders assisted the loan scheme in any manner including advice, counsel, or persuasion.

With respect to the claim Mr. Flanders is a co-conspirator, Georgia courts require evidence that "two or more persons in any manner either positively or tacitly come to a mutual understanding that they will accomplish the unlawful design." Cook v. Robinson, 116 S.E.2d 742, 745 (Ga. 1960). There is no evidence of such an express or tacit mutual understanding regarding the loan scheme between its perpetrators, Messrs. Akridge and Wilkerson, and either Defendant.

For these reasons, Defendants are entitled to summary judgment with respect to Plaintiffs' GPLA and GILA claims.

## IV. Because There is No Valid Argument for Imposition of Vicarious Liability Under Georgia Law, the Court Grants Summary Judgment on Plaintiffs' Claims For Common Law Conversion and Usury

Plaintiffs also bring claims against Defendants for common law conversion and violation of Georgia's usurious loan statute, O.C.G.A. § 7-4-1 to -21. (Doc. 1, pp. 13-14.) Conversion requires proof of an unauthorized exercise of ownership rights over another's personal property, an act of dominion over another's personal property inconsistent with his rights, or an unauthorized appropriation. DCA Archs., Inc., v. Am. Bldg. Consult., Inc., 417 S.E.2d 386, 388 (Ga. Ct. App. 1992). Usury is, at its essence, the issuance of loans under terms that generate a "a greater profit than is authorized by law" when "made with an intent to violate the law." Knight v. First Fed. Sav. & Loan Ass'n., 260 S.E.2d 511, 514 (Ga. Ct. App. 1979) (quoting Bank of Lumpkin v. Farmers State Bank, 132 S.E. 221, 225 (1926)); see also O.C.G.A. § 7-4-1. Plaintiffs do not contend Defendants converted their money or issued usurious loans, but instead claim Defendants are vicariously liable for the actions of Messrs.

Akridge and Wilkerson. Defendants are entitled to summary judgment because, as explained in § III.D., <u>supra</u>, there is no valid argument for imposition of vicarious liability under Georgia law.

## V. Defendants Should Not Be Ordered to Abate a Nuisance They Did Not Create or Sustain and Which No Longer Exists

Even assuming the loan scheme constituted a nuisance under Georgia law, there is no liability unless the defendant is "'either the cause or a concurrent cause of the creation, continuance, or maintenance of the nuisance.'" <u>Grinold v. Farist</u>, 643 S.E.2d 253, 255 (Ga. Ct. App. 2007) (quoting <u>Fielder v. Rice Constr. Co.</u>, 522 S.E.2d 13, 16 (Ga. Ct. App. 1999)). For all the reasons explained §§ III.A-C., <u>supra</u>, no reasonable juror could find Defendants created, continued, or maintained the loan scheme, and an order of abatement would serve no purpose because Mr. Flanders already instructed Mr. Akridge to cease the loan scheme upon receipt of the lawsuit. Thus, Defendants are entitled to summary judgment as to Plaintiffs' nuisance claim.

## VI. Plaintiffs Are Not Entitled to Punitive Damages Because There is No Valid Underlying Claim For Relief

Because there is no punitive damages claim in the absence of a valid underlying claim for relief, summary judgment as to the punitive damages claim is appropriate. <u>See, e.g.</u>, <u>Nelson & Hill, P.A. v. Wood</u>, 537 S.E.2d 670, 677 (Ga. Ct. App. 2000) (affirming dismissal of punitive damages claim in absence of claim for actual damages to which it could attach).

## VII. Plaintiffs' Adverse Inference Requests Do Not Change the Outcome

Not ones to forego an argument regardless of potential for success, Plaintiffs make two overarching arguments with which a fulsome order must contend. First, they argue entitlement to adverse inferences due to intentional spoliation by Defendants. (Doc. 96,

pp. 3-4.)  Because the Court properly denied Plaintiffs' motion for sanctions, the argument fails.  (See docs. 106, 131.)  Second, in response to the defense argument that Plaintiffs cannot prove damages, Plaintiffs claim entitlement to adverse inferences because Messrs. Akridge and Wilkerson asserted the Fifth Amendment privilege against self-incrimination in response to questions regarding their loan scheme.  (Doc. 96, pp. 4-6.)  Plaintiffs seek inferences "that the loan terms were universally $6.00 for $20.00, rounded down, and that all dual-endorsed paychecks constitute loans on these terms."  (Id. at 6.)  The Court has assumed the loans are usurious throughout this Order, and whether Plaintiffs can prove damages is irrelevant to the summary judgment rulings herein.

## CONCLUSION

For the reasons set forth above, the Court **DENIES** Plaintiffs' motion to add a RICO claim against Mr. Flanders, (doc. 96, p. 9), **GRANTS** Defendants' motions for summary judgment, (docs. 87, 88), and **DIRECTS** the Clerk to Court to **ENTERS** a final judgment in favor of Defendants, and to **CLOSE** this civil action.

**SO ORDERED**, this 25th day of March, 2019.

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA